## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHARRISE WALKER,

        Plaintiff,

                                   Case No. 04-71491

v.                                     Hon. Gerald E. Rosen

CITY OF DETROIT,

        Defendant.

_____/

## OPINION AND ORDER REGARDING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on         August 8, 2005       

PRESENT:  Honorable Gerald E. Rosen
                United States District Judge

## I.  INTRODUCTION

Plaintiff Charrise Walker commenced this action in this Court on April 21, 2004,

alleging that her employer, Defendant City of Detroit, violated Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliott-Larsen Civil Rights

Act (the "Elliott-Larsen Act"), Mich. Comp. Laws § 37.2101 *et seq.,* by retaliating

against her in various ways for opposing the allegedly discriminatory conduct of her

supervisor, Michael Lane.  This Court's subject matter jurisdiction rests upon Plaintiff's

assertion of a federal Title VII claim.  See 28 U.S.C. §§ 1331, 1343(a)(4).

By motion filed on December 30, 2004, Defendant now moves for summary

judgment in its favor on Plaintiff's state and federal claims of retaliation. In support of this motion, Defendant principally argues that Plaintiff did not engage in any protected activity that could sustain a retaliation claim under either Title VII or the Elliott-Larsen Act. Alternatively, Defendant contends that Plaintiff cannot establish a *prima facie* case of retaliation, and that the record fails as a matter of law to demonstrate that the legitimate reasons identified by Defendant to justify its actions are a mere pretext for unlawful retaliation. Plaintiff filed a response in opposition to this motion on January 20, 2005, and Defendant filed a reply brief in further support of its motion on January 28, 2005.

On June 10, 2005, the Court heard argument on Defendant's motion. Having considered the contentions of counsel at this hearing, and having reviewed the parties' briefs and accompanying exhibits, the Court now is prepared to rule on this motion. This Opinion and Order sets forth the Court's rulings.

## II. <u>FACTUAL BACKGROUND</u>

Plaintiff Charrise Walker began working for the Defendant City of Detroit in approximately March of 2000. She initially was hired as a senior accountant in the debt management division of Defendant's finance department, but was promoted to the position of principal accountant and transferred to the project administration division in approximately February of 2002. She remained in this position at all times pertinent to this litigation, reporting directly to manager Michael Lane.[1] Both Plaintiff and Lane are

---

[1]In the summer of 2004, a few months after this suit was filed, Plaintiff requested and was granted a transfer to a different division. In her current position, Plaintiff remains a principal accountant but is no longer supervised by Lane.

African American.

**A.    Plaintiff's Complaints About the Allegedly Discriminatory Conduct of Supervisor Michael Lane**

In March of 2003, Plaintiff was assisting Lane in recommending additional budget cuts for Defendant's 2003-04 fiscal year[2] when Lane allegedly made racially derogatory remarks about two of Defendant's Caucasian employees, Oskar Ousmanov and Jerry Johnston.  At one meeting with Lane during this period, Plaintiff expressed her excitement that Ousmanov recently had been promoted to principal accountant, and Lane allegedly responded that Defendant's chief accounting officer, Ricardo Kisner, "loves his white boys."  (Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 29.)  Later in this meeting, Lane suggested that one principal accountant should be laid off from Defendant's general accounting division.  Since Ousmanov worked in this division and had less seniority in light of his recent promotion, Plaintiff believed that this recommendation was targeted at Ousmanov and linked to Lane's earlier remark about "white boys."

At another meeting with Lane a few days later, Plaintiff expressed her view that layoffs would make it difficult for the finance department to complete its tasks, and she suggested that Lane consider various other options, such as leaving vacant positions unfilled, in order to alleviate the department's budget difficulties.  According to Plaintiff, Lane responded by stating, "F**k Oskar [Ousmanov] and Jerry [Johnston].  They have to go."  (Id. at 88-89.)  Plaintiff further testified that Lane took out a list and identified

---

[2]Defendant's fiscal year runs from July 1 through June 30 of the following year.

several African American employees as "need[ing] to keep their job[s]." (Id. at 89.)

When Plaintiff objected that "this is not right," Lane stated that she "could be laid off or

demoted," and Plaintiff left the meeting. (Id.)[3]

Plaintiff has testified that she lodged both verbal and written complaints about

Lane's conduct. Within a few days after these incidents, Plaintiff informed Defendant's

finance director, Sean Werdlow, and its chief accounting officer, Ricardo Kisner, about

Lane's comments to her during their recent meetings.[4] In addition, on September 8, 2003,

several months after the meetings at issue, Plaintiff sent a detailed, three-page letter to

Werdlow, Kisner, and Matt Grady, Defendant's deputy finance director, complaining

about Lane's conduct during the 2003-04 budget preparation process, and specifically

recounting Lane's objectionable race-based remarks during his budget meetings with

Plaintiff. (See Defendant's Motion, Ex. 3, 9/8/2003 Letter.)[5] Plaintiff also identified

several other instances of Lane's alleged mistreatment of her and her co-workers over the

past several months, and she asked "that I not be subjected to the same working

conditions during this year's budget process." (Id. at 3.)

---

[3]According to Plaintiff, Ousmanov was not laid off, but instead was demoted to the position of senior accountant. The record fails to indicate whether Johnston was laid off or demoted.

[4]In an affidavit accompanying Defendant's motion, Werdlow denies that he was aware of Plaintiff's concerns about Lane before he received the September 8, 2003 letter discussed below.

[5]In the letter, Plaintiff stated that these remarks were made in November of 2002, but she testified at her deposition that these incidents occurred in March of 2003.

4

**B.      Lane's Alleged Retaliation Against Plaintiff**

Following her complaints about Lane's conduct, Plaintiff claims that Lane

subjected her to a variety of forms of retaliatory treatment.  First, Plaintiff testified that

Lane attempted to interfere with her assignment to a project at the Detroit Zoo that

resulted in her working outside of Lane's direct supervision.  According to Plaintiff, Sean

Werdlow instructed her in August of 2003 to work three days a week at the zoo under the

direction of another manager, and the remaining two days in Defendant's downtown

Detroit office under Lane's supervision.  Lane responded by repeatedly questioning why

Plaintiff had accepted this assignment, and ultimately demanding that she return

exclusively to his direct supervision.

Plaintiff next asserts that Lane improperly denied her request to take a vacation

day on October 23, 2003, during the period when she was spending a portion of her time

at the zoo.  According to Plaintiff, Lane refused to honor this request unless she agreed to

work two consecutive days at the Detroit office prior to the requested day off.  Plaintiff

also claims that Lane aggressively questioned her about the need for time off.  All of this,

in Plaintiff's view, amounted to additional conditions upon her use of vacation days that

were not imposed upon other employees.

Similarly, Plaintiff asserts that Lane treated her differently in deciding whether she

could take compensatory time for doctor's appointments, and that he improperly denied at

least one such request.  On one such occasion in November of 2003, Plaintiff asked to use

an hour of compensatory time to attend a scheduled doctor's appointment.  Lane initially

stated that he "wasn't going to approve" this request, and indicated more generally that "I'm not approving any of your time," but he ultimately granted the time off after Plaintiff "pleaded and begged to go to the doctor." (Plaintiff's Dep. at 161-62.)

Later that month, Lane denied Plaintiff's request to use 30 minutes of compensatory time in order to leave work early for a doctor's appointment, stating in e-mail messages that "you should request time off more than 6 hours in advance" and that "[w]e are all very busy this week." (Plaintiff's Response, Ex. 10; see also Plaintiff's Dep. at 110-11.)[6] Again, in Plaintiff's view, this incident reflected Lane's imposition of unique conditions upon her use of compensatory time, while other workers were not required to satisfy these same conditions.

In the most recent such incident, which occurred in June of 2004, Plaintiff sought permission several days in advance to use an hour of compensatory time, and she claims that Lane initially granted this request. On the date covered by the request, however, Lane reprimanded Plaintiff in an e-mail message, stating that she had not secured the appropriate approval. (See Plaintiff's Response, Ex. 17.) Lane stated that he would "approve the time off in this instance but it will be the last time," and he cautioned that "[y]ou have been notified of the fact that I am fully enforcing the time off request policy." (Id.)

Next, Plaintiff testified that Lane disparaged her in front of her co-workers.

_____

[6]As discussed below, Plaintiff contends that Lane approved other employees' requests for compensatory time off during the same time period, despite his claim in an e-mail message to Plaintiff that all such requests had been denied because of the department's "very busy" week.

Specifically, during an October 22, 2003 staff meeting, Lane purportedly stated that "he was giving [Plaintiff] the simple parts of the budget and that one section of the budget required [her] to do nothing."  (Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 85.) Plaintiff viewed this as "a form of harassment," as it suggested to co-workers in less senior positions that Plaintiff, despite her position as a principal accountant, was not competent to perform difficult tasks.  (Id.)

As the next instance of alleged retaliation, Plaintiff contends that Lane set her up to fail — a failure that allegedly led to a five-day suspension — by assigning her a project that could not be completed within the tight deadline established by Lane.  According to Plaintiff, Lane instructed her on February 13, 2004 to coordinate the monthly divisional budget meetings, but gave her "far less time than would normally be adequate to prepare for these meetings."  (Plaintiff's Response, Ex. 4, Plaintiff's Interrogatory Responses at 5.)  Plaintiff questioned Lane about the short notice she had been given, but Lane refused to reconsider the matter.  Plaintiff stated that her distress over this assignment caused her to "bec[o]me physically ill," so that she missed three days of work and was unable to complete the assignment on time.  (Id.)  In light of Plaintiff's failure to complete this assigned task, Lane imposed a five-day suspension for insubordination, (see Plaintiff's Response, Ex. 12, Notice of Suspension), and this disciplinary measure apparently was upheld at the first step of the applicable union grievance process.[7]

---

[7]Throughout her employment with Defendant, Plaintiff has been represented by the Association of Professional and Technical Employees, and the terms of her employment have been governed, at least in part, by a collective bargaining agreement between the association and

Finally, at around the same time as this suspension was imposed, Plaintiff asserts that Lane improperly refused to sign her time sheet for a date on which Plaintiff had been approved for leave under the Family and Medical Leave Act ("FMLA").  According to Plaintiff, she applied to Defendant's human resources department for FMLA leave covering the period from February 16, 2004 to March 15, 2004,[8] and this request for FMLA leave was granted.  Despite this approval, Lane refused to sign Plaintiff's time sheet for March 3, 2004, even after he was advised by Defendant's human resources department that Plaintiff could not be paid for this date without his signature.  As a result, Plaintiff claims that she lost a day's pay.

## C.    Procedural Background

On October 21, 2003, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had been retaliated against for "fil[ing] an internal complaint opposing racial discrimination."  (Defendant's Motion, Ex. 12.)[9]  On February 25, 2004, the EEOC issued a right-to-sue letter, stating that it would be unable to investigate and conciliate Plaintiff's charge within the requisite 180-day period.  (See Complaint, Ex. 2.)  This lawsuit followed on April 21, 2004.

## III.  ANALYSIS

---

Defendant.

[8]The forms supplied by Plaintiff's health care providers indicated that she was suffering from a mental health condition.  (See Plaintiff's Response, Ex. 13.)

[9]Plaintiff also claimed that she was the victim of disability discrimination, but she has not pursued any such claim in this litigation.

8

A.      **The Standards Governing Defendant's Motion**

Through its present motion, Defendant seeks summary judgment in its favor on

Plaintiff's state and federal claims of retaliation.  Under the pertinent Federal Rule,

summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — <u>Matsushita Electrical Industrial Co. v. Zenith</u>

<u>Radio Corp.</u>, 475 U.S. 574 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986),

and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) — ushered in a "new era" in the federal

courts' review of motions for summary judgment.  These cases, in the aggregate, lowered

the movant's burden in seeking summary judgment.[10]  As stated in <u>Celotex</u>:

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of proof.

<u>Celotex</u>, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles

governing motions for summary judgment.  These principles include:

\* Cases involving state of mind issues are not necessarily inappropriate for

---

[10]"[T]aken together, these three cases signal to the lower courts that summary judgment
can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful
trials."  10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, <u>Federal Practice &</u>
<u>Procedure</u>, § 2727, at 468 (1998) (footnote omitted).

summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is plausible.

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989).  See also

Nernberg v. Pearce, 35 F.3d 247, 249 (6th Cir. 1994).  The Court will apply these

standards in resolving Defendant's motion.

**B.     Plaintiff Has Established a Prima Facie Case of Retaliation.**

In her two-count complaint, Plaintiff has advanced claims of retaliation under Title

VII and Michigan's Elliott-Larsen Act.  Under the federal statute, an employer is

prohibited from "discriminat[ing] against any of his employees . . . because he has

opposed any practice made an unlawful employment practice by [Title VII], or because

he has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under" the Title VII statutory scheme.  42 U.S.C. § 2000e-3(a).

10

Similarly, the Michigan statute provides that an employer may not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."  Mich. Comp. Laws § 37.2701(a).

Whether brought under Michigan or federal law, a claim of retaliation ordinarily is analyzed under the familiar tripartite standard set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  See Harrison v. Metropolitan Government of Nashville & Davidson County, 80 F.3d 1107, 1118 (6th Cir. 1996); Polk v. Yellow Freight System, Inc., 876 F.2d 527, 530-31 (6th Cir. 1989); Rymal v. Baergen, 262 Mich. App. 274, 686 N.W.2d 241, 257 n.9 (2004).[11]  At the first stage of this analysis, Plaintiff must establish a *prima facie* case of retaliation.  To do so, she must show (1) that she engaged in protected activity, (2) that Defendant knew of this protected activity, (3) that Defendant subsequently took an employment action that was adverse to

_____

[11]As Plaintiff points out, a McDonnell Douglas burden-shifting analysis may be avoided if there is direct evidence that the challenged employment action was motivated by discriminatory or retaliatory intent.  See Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003).  Yet, while Plaintiff vaguely contends that the record here includes such direct proof of Lane's retaliatory motives for his alleged mistreatment of her, she fails to specifically identify any such evidence in her response to Defendant's motion.  Rather, the sole evidence that could be viewed as a direct demonstration of Lane's allegedly retaliatory intent is his warning during a March 2003 meeting that Plaintiff herself could be laid off or demoted if she did not cease her objections to Lane's race-based approach to solving the department's budget difficulties.  Even accepting Plaintiff's account of this incident, additional inferences would be necessary to conclude that Lane's March 2003 threat accurately reflected and foreshadowed his retaliatory motive *several months later* when he engaged in the various acts now challenged by Plaintiff. "The need to draw such inferences prevents [Lane's] remarks from constituting direct evidence" of retaliation.  Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003).

her, and (4) that there was a causal connection between the protected activity and the adverse action.  <u>Allen v. Michigan Dep't of Corrections</u>, 165 F.3d 405, 412 (6th Cir. 1999); <u>Polk</u>, 876 F.2d at 531.[12]

Although Defendant challenges Plaintiff's showing as to each of these four elements of a *prima facie* case, its principal attack is focused upon the requirement that a plaintiff must have engaged in "protected activity" in order to sustain a claim of retaliation.  Two types of conduct may qualify as "protected activity" under either Title VII or Michigan's Elliott-Larsen Act:

> Both Title VII and the Michigan Elliott-Larsen Civil Rights Act prohibit retaliatory conduct by an employer in two situations:  (1) when an employee has made a charge of discrimination, filed a complaint of discrimination, or otherwise participated in enforcement proceedings (the "participation clause"); or (2) when an employee has opposed a violation [of the Act] (the "opposition clause").

<u>Comiskey v. Automotive Industry Action Group</u>, 40 F. Supp.2d 877, 897 (E.D. Mich. 1999) (internal quotation marks and citation omitted).  In Defendant's view, Plaintiff's complaints in this case were too vague and informal to qualify as "protected activity" under either the "participation clause" or the "opposition clause" of the state and federal statutes.

The Court cannot agree.  While Plaintiff seemingly concedes that her verbal and

---

[12]As this Court previously has observed, Michigan law imposes a somewhat higher standard for establishing the "causal connection" prong of a *prima facie* case of retaliation.  <u>See</u> <u>Hoffman v. Sebro Plastics, Inc.</u>, 108 F. Supp.2d 757, 775 n.19 (E.D. Mich. 2000).  In particular, a plaintiff must show that her protected activity was a "significant factor" in the adverse employment action, a standard that "requires a showing of more than a 'causal link.'"  <u>Hoffman</u>, 108 F. Supp.2d at 775 n.19 (internal quotation marks and citations omitted).

written complaints to management are not encompassed within the "participation" prong

of the statutory definitions of "protected activity,"[13] there is no doubt that Plaintiff's

written complaint, at least, qualifies as "opposition" to a purported violation of state and

federal antidiscrimination law.  In her September 8, 2003 letter to three senior managers

in Defendant's finance department, Plaintiff expressly complained of the "racist and

derogatory comments" made by Michael Lane "while referring to two Caucasian male

employees, Oskar O[u]smanov and Jerry Johnston."  (Defendant's Motion, Ex. 3,

---

[13]As a matter of Title VII law, it would appear that Plaintiff's internal complaints to management would not satisfy the "participation clause" requirement that she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing," 42 U.S.C. § 2000e-3(a), because no EEOC charge was pending at the time of these complaints.  See Abbott, 348 F.3d at 543.

Matters are not so clear, however, as to the proper construction of the analogous "participation clause" found in Michigan's Elliott-Larsen Act.  The Michigan Court of Appeals expressly rejected the Sixth Circuit's narrow reading of this clause in Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989), and instead found that the Michigan anti-retaliation statute is triggered "[r]egardless of the vagueness of the charge or the lack of formal invocation of the protection of the [Elliott-Larsen] act," so long as an employee "rais[es] the spectre of a discrimination complaint" in an internal complaint.  McLemore v. Detroit Receiving Hospital & University Medical Center, 196 Mich. App. 391, 493 N.W.2d 441, 443 (1992); see also Neilley v. State Farm Ins. Cos., 202 F.3d 269, 1999 WL 1281717, at *7 (6th Cir. Dec. 29, 1999) (noting the Michigan courts' rejection of Booker).  Yet, it is not entirely clear whether the ruling in McLemore rests solely upon a broad construction of the "participation clause," or whether the decision speaks more generally to the sorts of "protected activity" encompassed by the Elliott-Larsen anti-retaliation provision as a whole, including both the "participation" and "opposition" clauses.

The Court need not resolve this issue, because Plaintiff's complaints to management fit quite comfortably within the "opposition" clause as construed by the Michigan and federal courts alike.  It is at least clear, however, that Defendant's heavy reliance on Booker is somewhat misplaced, in light of the Michigan courts' explicit rejection of Booker's reading of a Michigan statute — a rejection that is nowhere acknowledged in Defendant's submissions to this Court.

9/8/2003 Letter at 1.)  Plaintiff further explained that at least some of these remarks were made in direct response to her specific question as to why Lane had selected certain accountant positions for layoff in the department's budget-cutting process.  Plaintiff then stated that when she continued to "question[] Lane's rationale," she was "told that I could be demoted or laid off."  (Id.)  Finally, Plaintiff recounted another incident in which Lane expressed his dissatisfaction with Ousmanov's promotion and stated that "Rick (Kisner) loves his white boys," (id.), and she noted that Ousmanov subsequently was demoted.

A trier of fact could readily conclude that Plaintiff made these various statements in an effort to oppose possible violations of Title VII and the Elliott-Larsen Act.  A racially motivated layoff or demotion plainly would violate either statute, and Plaintiff's letter clearly suggests the possibility that Lane's personnel decisions might be impermissibly based upon considerations of race.  Under Michigan's Elliott-Larsen Act, an employee's communications must "raise[] the specter of a discrimination complaint" in order to constitute "protected activity."  See Rymal, 686 N.W.2d at 315-16; McLemore, 493 N.W.2d at 443.  Similarly, Title VII's "opposition clause" encompasses "complain[ts] to anyone," including management, about "any practice that the employee reasonably believes to be a violation of Title VII."  Johnson v. University of Cincinnati, 215 F.3d 561, 579 (6th Cir. 2000).  Plaintiff's complaints to senior management about possible race discrimination in Lane's employment decisions would satisfy either of these standards for "protected activity."

Accordingly, the Court rejects Defendant's contention that Plaintiff's complaints

14

were too "vague" to be viewed as opposing a possible violation of Title VII or the Elliott-Larsen Act. In contrast to the facts of <u>Booker</u>, 879 F.2d at 1309, the sole case cited by Defendant, Plaintiff's letter expressly accused Lane of making racist remarks targeted at two particular white employees, and she directly linked these comments to the specific context of employment decisions about layoffs and demotions.[14] Likewise, Defendant's various challenges to the merits of Plaintiff's charges of race discrimination are immaterial,[15] where an employee need only have a "good faith belief that the opposed practices were unlawful," and where "a violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful." <u>Johnson</u>, 215 F.3d at 579-80 (internal quotation marks and citations omitted). There is no evidence that Plaintiff acted in bad faith in advancing the various race-based complaints about Lane in her September 8, 2003 letter. Consequently, the Court finds that Plaintiff has satisfied the "protected activity" prong of a *prima facie* case of retaliation.

Plaintiff also has satisfied the second prong of her *prima facie* case, under which

---

[14]Matters might be different if the record here were limited solely to Plaintiff's verbal complaints to senior management in March of 2003, where Plaintiff's deposition testimony and interrogatory responses are quite vague as to what she told management at the time. Plaintiff testified at her deposition, for example, that she recounted Lane's "derogatory remarks" to a number of individuals, including senior management officials Sean Werdlow and Ricardo Kisner, and that she generally described "this incident" to Werdlow and Kisner. (Plaintiff's Dep. at 31-33.) This record alone might not be sufficient to establish Plaintiff's opposition to an employment practice made unlawful under Title VII or the Elliott-Larsen Act. There is no such lack of specificity, however, in the complaints raised in Plaintiff's subsequent letter.

[15]Defendant notes, for example, that white and black employees alike were affected by the City's workforce reduction measures, and suggests that the alleged racial bias of Lane or any other individual supervisor would be tempered by "the many checks and balances involved in the [City's] budget process." (Defendant's Motion, Br. in Support at 11-12.)

she must establish that Defendant was aware of her protected activity.  Plaintiff sent her September 8, 2003 letter to three senior management officials in Defendant's finance department, and one of these individuals, deputy finance director Matthew Grady, expressly acknowledged at his deposition that he was both aware of and familiar with Plaintiff's written complaint.  (See Plaintiff's Response, Ex. 3, Grady Dep. at 21-22.) Indeed, Grady testified that Plaintiff's letter precipitated — or, at a minimum, was a topic of discussion at — a meeting among himself, Lane, and Cynthia Johnson from Defendant's human resources department, in light of the charges of discrimination that Plaintiff had lodged against Lane.  (See id. at 16-17, 21-22.)  Grady further testified that Johnson initiated an investigation of Plaintiff's complaint,[16] resulting in a report that purportedly found no improprieties in Lane's dealings with Plaintiff.  (See id. at 22-23.)[17] Finally, Lane himself testified that Grady provided him with a copy of Plaintiff's written complaint.  (Defendant's Motion, Ex. 5, Lane Dep. at 128.)  This record amply establishes that Defendant's management generally, and Lane specifically, were aware of Plaintiff's protected activity.

---

[16]In light of this testimony that Plaintiff's letter triggered an internal investigation into possible discrimination, it is all the more difficult to see how Defendant can plausibly argue that Plaintiff did not engage in protected activity.  Despite the purported "vagueness" of Plaintiff's complaints in her letter, the recipients of this letter evidently were able to discern that she raised allegations of discrimination that warranted further inquiry by Defendant's human resources department.

[17]Grady could not recall, however, whether the investigation or report addressed Plaintiff's complaints about Lane's allegedly discriminatory conduct toward Oskar Ousmanov. (See id. at 23.)

Under the third prong of the *prima facie* inquiry, Plaintiff must show that she suffered an adverse employment action. As discussed earlier, Plaintiff has testified to a number of instances of threatened or actual adverse treatment she suffered following her September 8, 2003 complaints to management about Lane's conduct toward her and other employees. Notably, in challenging Plaintiff's showing on the "adverse action" element of her *prima facie* case, Defendant utterly fails to address the sole pertinent question: namely, whether the various instances of alleged mistreatment identified by Plaintiff constitute "adverse actions" under the governing Title VII and Elliott-Larsen case law. Instead, Defendant argues only that it was justified in taking the various actions in question, and that Plaintiff's allegations of retaliatory motives for these actions are "absurd." (Defendant's Motion, Br. in Support at 13-19.) Whatever the relevance of these contentions to the causation prong of a *prima facie* case or the subsequent steps of a McDonnell Douglas analysis, they have absolutely no bearing upon the Court's "adverse action" inquiry.

In any event, the Court finds that Plaintiff has established this element of her *prima facie* case. To demonstrate the requisite adverse action, Plaintiff must show a "materially adverse" change in the terms or conditions of her employment, as opposed to a "mere inconvenience," an "alteration of job responsibilities," a "bruised ego," or a reassignment "without salary or work hour changes." Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885-86 (6th Cir. 1996) (internal quotation marks and citations omitted); see also White v. Burlington Northern & Sante Fe Railway Co., 364 F.3d 789, 797-800

17

(6th Cir. 2004) (*en banc*) (adhering to the <u>Kocsis</u> standard in a Title VII retaliation case). To the extent that Plaintiff cites instances where Lane merely threatened an adverse action — *e.g.,* a denial of a request for time off — but did not follow through on these threats, such incidents did not produce any "materially adverse" change in the terms or conditions of Plaintiff's employment.  Further, there is no evidence that Lane's insistence that Plaintiff return from the Detroit Zoo project and resume working at the downtown Detroit office resulted in a tangible loss of pay or benefits or any material change in her job responsibilities.

Yet, there is no denying the material and tangible effect of at least some of Lane's allegedly retaliatory actions — most significantly, his imposition of a five-day suspension after Plaintiff was unable to complete an assignment under a purportedly unreasonable deadline.  In addition, a denial of vacation benefits, FMLA paid leave, or compensatory time off presumably would constitute a "tangible" or "material" adverse change in the conditions of Plaintiff's employment.  <u>See</u> <u>White</u>, 364 F.3d at 797-98.[18]  Thus, the third element of a *prima facie* case of retaliation is established here.[19]

---

[18]This assumes, of course, that Plaintiff can establish her entitlement to these benefits, despite Defendant's various contentions to the contrary.  As explained, this inquiry is properly addressed under the subsequent steps of the <u>McDonnell Douglas</u> burden-shifting analysis.

[19]In light of this conclusion, the Court need not address Plaintiff's contention that it is appropriate to aggregate a number of employment actions that would not be sufficiently "adverse" if viewed in isolation.  The Court notes, however, that such aggregation clearly is permissible in cases where a plaintiff is pursuing a "retaliatory harassment" theory of recovery. <u>See</u> <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 791-92 (6th Cir. 2000).  Since Plaintiff has not indicated that she is pursuing such a theory here, the Court need not consider its viability under the present record.

18

This leaves only the requirement that Plaintiff establish a causal connection between her protected activity and an adverse action taken against her. Again, Defendant offers little or nothing in the way of relevant argument on this subject. Rather, Defendant points only to Plaintiff's acknowledgments (i) that Lane never expressly told her that he was retaliating against her, and (ii) that no other witness has testified to any such statement by Lane or any other supervisor.[20] Be that as it may, the "causal connection" element of a *prima facie* case can be established through evidence less direct than a supervisor's explicit statement that he acted with a retaliatory purpose.

In particular, the courts have recognized that the requisite causal connection can be inferred from a combination of (i) close temporal proximity between protected activity and adverse consequences, and (ii) other evidence that is suggestive of a causal link. See, e.g., Johnson, 215 F.3d at 582-83; Rymal, 686 N.W.2d at 263. Plaintiff has testified that, prior to the incidents of which she complains in this case, she consistently received positive feedback from management about her work performance, and she received all of the merit pay increases for which she was eligible. (See Plaintiff's Dep. at 170-73.) Lane largely confirmed this point at his deposition, stating that he had never documented any deficiencies in Plaintiff's performance prior to the incident that led to her five-day

---

[20]Defendant also claims that Plaintiff has failed to produce evidence that Lane or anyone else in Defendant's management viewed her verbal complaints or September 8, 2003 letter as opposing an unlawful employment practice. Assuming, for the moment, that this point has any bearing on the "causal connection" prong of a *prima facie* case of retaliation, the above-cited testimony of Matthew Grady raises an issue of fact, at least, as to whether the senior management of Defendant's finance department perceived that Plaintiff was complaining of discriminatory conduct that might violate federal or state law.

suspension, that he had "praised her . . . highly" for her work on an earlier project, and that he generally had no issues or problems with her work prior to March of 2003.  (See Defendant's Motion, Ex. 5, Lane Dep. at 70-71, 91.)  Under these circumstances, the close temporal proximity between Plaintiff's written complaint in September of 2003 and the several instances of Lane's alleged mistreatment of her over the next few months would support an inference of a causal link.

Other evidence lends additional support to this inference.  First, Lane's express threat of retaliation when directly challenged by Plaintiff during one of their March 2003 meetings could be viewed as evidencing a predisposition to retaliate against employees who question his decisions.  Next, Plaintiff's deposition testimony reflects a consistent pattern of Lane questioning her work and closely scrutinizing her requests for vacation days and compensatory time off in the fall months of 2003 and the early part of 2004.  In contrast, Plaintiff testified that her requests for vacation and compensatory time off were routinely granted prior to this period.  Viewed in its totality, this record would permit the inference that the adverse actions suffered by Plaintiff were causally linked to her protected activity.  This suffices to establish the fourth and final prong of a *prima facie* case of retaliation.

## C.    Questions of Fact Remain as to Whether Defendant's Stated Non-Retaliatory Justifications for Its Actions Are Pretextual.

Plaintiff having established a *prima facie* case of retaliation, Defendant next bears a burden of production to articulate a legitimate, non-retaliatory reason for taking the

various adverse actions identified by Plaintiff.  <u>Morris</u>, 201 F.3d at 793.  Once Defendant

meets this burden, Plaintiff "then must demonstrate that the proffered reason was not the

true reason for the employment decision."  <u>Morris</u>, 201 F.3d at 793 (internal quotation

marks and citations omitted).  Although Defendant summarily argues in its motion that

Plaintiff has failed to meet this burden, the Court finds that issues of fact remain as to

whether the legitimate, non-retaliatory grounds set forth by Defendant as justifying its

various actions are merely a pretext for unlawful retaliation.

Defendant bears only a burden of production at the second stage of the <u>McDonnell</u>

<u>Douglas</u> inquiry, and this burden is not at all onerous.  Nonetheless, this might be the rare

case in which an employer is unable to meet even this burden, at least as to some of the

adverse actions identified by Plaintiff.  Beginning with the most tangible of these actions,

Plaintiff has stated in her sworn interrogatory answers that in February of 2004, Lane

assigned her to coordinate the monthly divisional budget meetings but imposed a deadline

that was inadequate to complete this task.  When she sought additional time, Lane refused

this request and insisted upon adherence to the original deadline.  Plaintiff failed to meet

this deadline, and Lane responded by suspending her for five days in late February and

early March of 2004, citing the offense of "insubordination" by "fail[ing] to obey a lawful

and reasonable order."  (Plaintiff's Response, Ex. 12, 2/24/2004 Notice of Suspension.)

While Defendant claims a legitimate, non-retaliatory basis for this suspension, the

cited portions of the record fail to substantiate this claim in any way.  The portions of

Matthew Grady's deposition testimony cited by Defendant, for example, address only (i)

21

the issue of Plaintiff's assignment to the Detroit Zoo in the late summer and early fall of 2003, (<u>see</u> Defendant's Motion, Ex. 1, Grady Dep. at 43-44), (ii) a conversation he had with Lane, apparently in or around July of 2003 (or perhaps July of 2004), addressing Lane's general concern that Plaintiff was "unwilling[] to work in the budget process" and to serve as Lane's back-up in this process if he were unavailable, (<u>id.</u> at 14-15), and (iii) the general topics of how often he met with Lane and the extent of his interactions with Lane's subordinates, (<u>id.</u> at 10, 18.)

The cited portions of Lane's deposition are similarly inapposite — again, addressing such matters as the zoo assignment, (<u>see</u> Defendant's Motion, Ex. 5, Lane Dep. at 102) — with the exception of a passage in which he discusses the incident that purportedly led to Plaintiff's suspension. Unfortunately, the incident identified by Lane arose, by his account, in the summer of 2003, when he assigned Plaintiff the task of reviewing a contract so that the matter could be addressed at a City Council meeting the following week. (<u>See</u> <u>id.</u> at 80.) Lane acknowledged that he gave Plaintiff a fairly short deadline for this project, but testified that Plaintiff's failure to complete the task was due to her utter refusal to do it. (<u>See</u> <u>id.</u> at 80-83.) Lane testified that this "made me look bad because I didn't get [the project] done" within the time frame demanded by his superiors, so he wrote Plaintiff up for insubordination. (<u>Id.</u> at 83.)

The Court simply is unable to view this testimony as providing a legitimate, non-retaliatory explanation for Plaintiff's five-day suspension in February of 2004. Significantly, Plaintiff has identified an entirely different task — the coordination of

22

divisional budget meetings — that she admittedly was unable to complete under the deadline imposed by Lane.  Under the present procedural posture, the Court necessarily is bound to view the record in a light most favorable to Plaintiff, and to accept her version of the incident leading to her suspension.  In any event, Plaintiff's account is inherently more plausible than Lane's, as she has identified a project that was assigned to her shortly before Lane imposed the five-day suspension.  In contrast, Lane's deposition testimony addresses an incident that occurred *six or more months before* this suspension.  Viewing this record favorably to Plaintiff, it appears that Lane is discussing an entirely separate event, so that his testimony cannot be read as supplying a legitimate, non-retaliatory reason for his actions in connection with the incident that actually resulted in Plaintiff's suspension in February of 2004.

Defendant fares somewhat better in providing legitimate justifications for the other adverse actions identified by Plaintiff.[21]  Regarding the denial of Plaintiff's request for vacation time in October of 2003, Lane testified at his deposition that this request came at a time when the department was struggling to keep up with its mounting workload, so that he could not afford to allow Plaintiff to miss work during this period.  Regarding the denial of pay for one day during a period when Plaintiff had been approved for FMLA leave, Lane testified that Defendant's policy called for employees to call in and report

---

[21]As discussed earlier, some of the actions claimed as adverse by Plaintiff did not result in any tangible detriment to the terms or conditions of her employment.  These matters, therefore, need not be addressed in the second and third stages of the Court's <u>McDonnell Douglas</u> analysis.

their absences under these circumstances, and that Plaintiff was denied a day's pay for

failing to provide this notice on the date in question.[22]  Finally, regarding the denial of

Plaintiff's request for compensatory time off in November of 2003, the e-mail messages

provided by Plaintiff reflect Lane's explanation that Plaintiff had given insufficient notice

of her need for time off and that the department was "very busy" at the time.  (Plaintiff's

Response, Ex. 10.)[23]

In light of these explanations, Plaintiff bears the burden of showing that

Defendant's non-retaliatory justifications for its actions are a mere pretext for unlawful

retaliation.  Viewing the record in a light most favorable to Plaintiff, the Court finds that

she has met this burden.  First, as to the denial of Plaintiff's request for a vacation day in

October of 2003, the e-mail messages produced by Plaintiff reflect that Lane sought to

negotiate the terms of this request for time off, insisting that she work two consecutive

days at the department's downtown Detroit office earlier in the week in question, and

seeking additional information from Plaintiff regarding the purpose for this time off.  (See

Plaintiff's Response, Ex. 9.)  Yet, Plaintiff has stated in her sworn interrogatory answers

---

[22]The Court notes that it discovered this explanation through its own independent review of Lane's deposition testimony.  Defendant's motion and accompanying brief fail to cite this portion of the record, instead offering only the bare assertion (without citation to the record) that Plaintiff was not paid because she "was AWOL."  (Defendant's Motion, Br. in Support at 18.)  It is not the Court's obligation to identify evidentiary support for a party's position.

[23]Again, the Court gleaned this explanation through its own review of the record.  In addressing this matter in its brief, Defendant states only that compensatory time "is granted at the discretion of management."  (Defendant's Motion, Br. in Support at 18.)  Be that as it may, a plaintiff certainly could establish a claim of retaliation by showing that a supervisor's exercise of "discretion" in a given instance was motivated by impermissible retaliatory considerations.

24

that Lane had "never before requested documentation or explanation f[rom] any of his employees as a basis for the denial or approval of vacation requests. (Plaintiff's Response, Ex. 4, Plaintiff's Interrogatory Responses at 3-4.) Lane seemingly confirmed this contention at his deposition, stating that he did not usually require documentation from his employees regarding the purpose of their requests for vacation, and denying that he ever asked his employees why they were taking a day of vacation. (See Defendant's Motion, Ex. 5, Lane Dep. at 116.) This suffices to raise issues of fact as to the truthfulness of Defendant's proffered reason for denying Plaintiff's request for vacation.

Plaintiff also has identified a contradiction in the record as to the reason given by Lane in denying Plaintiff's request for compensatory time off in November of 2003. Although Lane stated at the time that "[w]e are all very busy this week" and that "I have not approved any time off requests as a result," (Plaintiff's Response, Ex. 10), Plaintiff has produced timesheets indicating that other employees were granted compensatory time off and vacation days during this same period. (See Plaintiff's Response, Ex. 11, Daily Time Reports.)[24] Again, this casts doubt on the veracity of Defendant's explanation for Lane's action.

The denial of pay for one day of Plaintiff's approved FMLA leave presents a closer question, because Plaintiff has not contradicted the factual basis for Lane's action

---

[24]In its reply brief, Defendant complains that these records have been "altered." These alterations, however, consist merely of notations that certain cryptic entries on the timesheets reflect an employee's use of compensatory time off or a vacation day. Defendant does not challenge the accuracy of these notations, and the Court has found them to be helpful in interpreting Defendant's records.

on this matter — namely, that Plaintiff failed to call in her absence in accordance with

Defendant's policy.  On the other hand, the personnel policy cited by Defendant in

support of Lane's testimony[25] requires that employees must call in their absences only

"[i]f permission has not already been granted."  (Defendant's Motion, Ex. 11, Manual of

Standard Personnel Practices § VI at 7.)  The paperwork supplied by Plaintiff on this

matter, while limited, could be read as indicating that her request for FMLA leave had

already been granted before the date in question, March 3, 2004, which arguably could

have relieved her of the obligation to call in her absence.  In addition, Plaintiff has

produced an e-mail message sent to Lane by Cynthia Johnson of Defendant's human

resources department, directing him to "come to our office and revise the timesheet" so

that Plaintiff could be compensated for the date at issue.  (Plaintiff's Response, Ex. 15.)

Viewing this record in a light most favorable to Plaintiff, Defendant's human resources

department evidently had concluded that Plaintiff was entitled to be paid for this date

falling within the period of her approved FMLA leave.

　　　In sum, Defendant has failed to meet its limited burden of production as to some of

the adverse actions that Plaintiff claims were fueled by retaliatory motives.  In other

instances, Plaintiff has raised issues of fact as to whether the legitimate reasons proffered

by Defendant are mere pretexts for unlawful retaliation.  It follows that Defendant is not

entitled to summary judgment in its favor on Plaintiff's state and federal claims of

---

[25]Once again, Defendant failed to cite to the appropriate passage in its personnel manual, leaving the Court to its own devices in determining Defendant's policy on this subject.

retaliation.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's December 30,

2004 Motion for Summary Judgment is DENIED.


<u>s/Gerald E. Rosen</u>
Gerald E. Rosen
United States District Judge


Dated:  August 8, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record
on August 8, 2005, by electronic and/or ordinary mail.

<u>s/LaShawn R. Saulsberry</u>
Case Manager